748 N.W.2d 660 (2008)
275 Neb. 722
Nathan PIERCE, appellant,
v.
The DOUGLAS COUNTY CIVIL SERVICE COMMISSION and the County of Douglas, Nebraska, appellees.
No. S-07-252.
Supreme Court of Nebraska.
May 16, 2008.
*662 Timothy S. Dowd, of Dowd, Howard & Corrigan, L.L.C., Omaha, for appellant.
Donald W. Kleine, Douglas County Attorney, and Bernard J. Monbouquette for appellees.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.
Nathan Pierce appeals from the district court's order affirming the decision of the Douglas County Civil Service Commission (the Commission). The Commission affirmed Pierce's termination of employment (termination) by the Douglas County Public Properties Department (the Department). Initially, the Department suspended Pierce for 3 days in 2001 for verbally abusing another employee. This appeal stems from Pierce's alleged violation of a work restriction placed on him because of his first offense. Pierce's employment is governed by a collective bargaining agreement (CBA) between Douglas County (the County) and the International Union of Operating Engineers, Local 571.
*663 This appeal presents two main issues. The first is whether the district court had jurisdiction over Pierce's petition in error that claimed the Department had breached the CBA. The second is whether the evidence supports Pierce's termination for committing a second offense of "[i]mmoral, indecent, disgraceful, or inappropriate conduct," as described in the Commission's personnel manual. We conclude that the district court did have jurisdiction over Pierce's claims that the Department breached the CBA as far as those allegations were relevant to Pierce's termination. However, we need not reach the merits of Pierce's claims under the CBA. We conclude that the evidence shows the Department did not consider Pierce's alleged conduct to be a serious violation of the Commission's personnel manual, warranting termination. We therefore reverse the district court's order affirming Pierce's termination.

BACKGROUND
Although Pierce was a Department employee, his job duties required him to do maintenance work throughout the Douglas County Health Center (the Health Center). In June 2001, the Department suspended Pierce for verbally abusing Kimberly Fisher Nahriri (Nahriri), a licensed practical nurse in the Health Center's assisted living unit. After Nahriri refused to take Pierce's blood pressure, Pierce became belligerent. He frightened Nahriri by putting his arm on the back of her chair and his other arm on her desk, so that he hemmed her into her workstation. The Department suspended Pierce for two offenses under the Commission's personnel manual: (1) fighting or causing a disturbance and (2) "[i]mmoral, indecent, disgraceful, or inappropriate conduct" that may reasonably be expected to affect the public's confidence in county government.
After his suspension for this incident, the County's assistant personnel director issued a written directive imposing work restrictions on Pierce. The personnel directive ordered Pierce to have no contact with Nahriri. In addition, the directive required Pierce to request accompaniment by a coworker or management representative if he worked in Nahriri's unit. It further stated that Pierce's presence in Nahriri's unit without another Department employee would violate the directive.
Later, in November 2001, the Commission affirmed the Department's suspension of Pierce. In its order, the Commission strongly recommended that management of both the Health Center and the Department take further steps. It recommended management neither allow Pierce in or near any area in which Nahriri worked nor allow him to approach her, speak to her, or observe her. The Commission's order, unlike the personnel directive, did not address whether Pierce could be in Nahriri's unit if accompanied by a coworker.
The record fails to show whether the personnel director, the Health Center, or the Department ever issued any further written directives following the Commission's recommendations. Thus, the record reflects an inconsistency. The Commission's recommendations effectively barred Pierce from being in an area where Nahriri worked, while the personnel directive allowed Pierce to be in Nahriri's work unit if accompanied by a coworker.
In September 2002, after a predisciplinary hearing, the Department terminated Pierce's employment for violating the Commission's 2001 order. Although the Department alleged two separate violations, it terminated Pierce's employment for a violation that occurred on August 6, 2002. At the Commission's hearing regarding the termination, the evidence of the August 6 violation showed that Pierce *664 had walked through the assisted living unit in front of the nurses' station where Nahriri worked. While Nahriri was on duty, Pierce stopped to clean up some ice he spilled in front of the nurses' station. The Department accused Pierce of committing a second offense of "[i]mmoral, indecent, disgraceful, or inappropriate conduct." The punishment for a second offense was termination.
The August 6, 2002, alleged violation stemmed from an incident report written by Nahriri. In the report, Nahriri stated that she had observed Pierce walking through the assisted living area on August 6 and on three to four other occasions since June. She did not state whether a coworker had accompanied Pierce. Nahriri did not attend the predisciplinary hearing or testify at the evidentiary hearing before the Commission. Nahriri had also alleged that on August 29, Pierce looked at her through a window while she was in a courtyard. The Department included this allegation in its notice of disciplinary charges as a second incident supporting the charge. Yet, the Commission neither discussed nor relied on the August 29 allegation in upholding Pierce's termination.
In its notice of disciplinary charges, the Department did not accuse Pierce of being in Nahriri's unit unescorted or of violating the personnel directive. Instead, the notice stated that Pierce was near Nahriri's work area on August 6, 2002, violating the Commission's 2001 order. The notice stated that the 2001 order prohibited him from being in or near any area where Nahriri worked. But the evidence before the Commission showed that the Department disciplined Pierce for being in Nahriri's work unit unaccompanied. The Department's assistant director, Marvin Olson, drafted the notice of charges. And he jointly decided with the Department's director, Al Hogan, to terminate Pierce's employment. Before the Commission, Olson testified that the Department terminated Pierce's employment for violating the Commission's 2001 order by being in the vicinity of Nahriri unescorted on August 6.
At the public hearing before the Commission, the evidence also showed that the Department and Health Center administrators disagreed on the type of work restrictions imposed by the Commission's 2001 order. The Health Center's administrator testified that Hogan told Pierce he must stay out of the assisted living unit and stay away from Nahriri. Hogan did not testify. In contrast, Olson testified that Pierce was instructed not to go into the assisted living unit unescorted. He also stated that the Department made exceptions to the Commission's 2001 order to allow Pierce near Nahriri if someone escorted him. Olson specifically stated that "[i]n order to abide by the Civil Service guidelines, in order to remain efficient with the manpower that we had, we came to agree that . . . Pierce if he had to be in the vicinity of . . . Nahriri that he should do so in the presence of another engineer."
The record reflects other examples of misunderstandings about the work restrictions imposed because of the Commission's 2001 recommendations. For example, in August 2002, the personnel director wrote in a memorandum that he believed Nahriri understood Pierce could "be on the unit if accompanied by another Engineer." In contrast, the nursing director testified that she believed the Commission's order was controlling. She did not know until just before the public hearing in March 2004 that the personnel director had written that Pierce could work in Nahriri's unit if accompanied.
Pierce did not deny encountering Nahriri on August 6, 2002. In fact, he reported the incident to the temporary nursing director *665 right after it occurred. But he also reported to her that someone was accompanying him when he encountered Nahriri. Pierce similarly testified before the Commission that a teenage summer helper was accompanying him to do maintenance work in the assisted living unit when he accidentally spilled ice by the nursing station. He stated that he left the area when a housekeeper told him she would finish cleaning up the ice. He stated that he did not speak or make any gestures to Nahriri. Pierce testified that his supervisor had authorized the summer helper to work with him in the building. Neither the supervisor nor the summer worker testified, but a coworker verified that the Department had assigned a summer helper to work with Pierce.
The housekeeper who cleaned up the ice, Vera Hill, confirmed that Pierce immediately left the area without speaking or making gestures to Nahriri. Hill was not asked and did not specifically state whether Pierce was accompanied by a coworker during this incident. Before Pierce's termination, Hill had also prepared a written statement for the Department at her supervisor's request. The Commission admitted this statement at the hearing. In her statement, Hill said that while Nahriri was on duty, she had seen Pierce unaccompanied in the assisted living unit several times in the summer of 2002 and at least once in August. But she did not state that she had seen him in the unit unaccompanied on August 6, 2002, or when he spilled ice in front of the nurses' station.
The Commission found "conflicting testimony as to whether or not . . . Pierce was accompanied into the area in which he was required to have an escort." But it concluded that Pierce had failed to meet his burden of proving he was accompanied on August 6, 2002, because he did not present corroborating testimony. It therefore found that "Pierce violated the [2001] recommendation of the Commission and the work conditions of . . . Pierce as set forth by the County."
Pierce had also presented evidence at the Commission hearing to show that the Department and personnel director had violated the grievance procedures under the CBA. But other than to note that Pierce had raised these violations, the Commission did not address them.
Pierce filed a petition in error in the district court. In its order, the court rejected Pierce's claims that the County failed to produce sufficient evidence to support his termination. It also rejected his claim that the Commission had impermissibly shifted the burden of proof to him. It recognized that the "Commission's sole finding was that Pierce failed to provide corroborating evidence that he was accompanied by another employee when he was in . . . Nahriri's work area, violating the earlier recommendation (sanction), of the Commission." In addressing the burden of proof, the district court relied on this court's decision in Caniglia v. City of Omaha.[1] It concluded that Pierce had the "burden to show that good cause did not exist for his discharge from employment."
The court noted that Hill had reported in her written statement seeing Pierce in the assisted living unit unaccompanied several times in 2002, including one occasion in August. Based on this statement and the Commission's belief that Pierce was not credible, the court concluded that the evidence was sufficient to show Pierce's actions on August 6, 2002, violated the Commission's 2001 order. It further concluded the County had shown Pierce *666 committed the offense of "[i]mmoral, indecent, disgraceful, or inappropriate conduct."
Further, the court determined that the August 6, 2002, violation occurred within 1 year of November 1, 2001, when the Commission affirmed Pierce's suspension for the first violation. Thus, the court concluded the Department had not violated the CBA by charging Pierce with a second offense past the 1-year limit for using an offense for further disciplinary action. But the court determined that it did not have jurisdiction to decide Pierce's remaining claims that the County had breached the CBA. It concluded Pierce's compliance with the county claims statute[2] was a prerequisite to its exercising jurisdiction. Pierce appeals.

II. ASSIGNMENTS OF ERROR
Pierce assigns, restated, that the district court's order upholding the Commission's decision to terminate his employment was arbitrary and capricious, unreasonable, and unsupported by the facts and law for the following reasons: (1) There was no competent evidence that Pierce engaged in any misconduct on August 6, 2002; (2) the County did not initiate a disciplinary action within 10 working days of the incident on August 6 as required by the CBA; (3) the personnel director failed to respond within 10 days to Pierce's grievance as required by the CBA; (4) under the CBA, prior disciplinary offenses cannot be considered if they occurred more than 1 year before the incident for which the disciplinary action is being brought; and (5) the Commission did not render its decision within 5 calendar days of the hearing as required by the CBA.
Pierce further assigns that (1) the district court erred in concluding that it did not have jurisdiction under § 23-135 to decide his breach of contract claim and (2) the district court erred in failing to conclude that the Commission's decision violated Pierce's due process right to be free from double jeopardy by disciplining him twice for the same conduct.

STANDARD OF REVIEW
[1-4] In reviewing an administrative agency decision on a petition in error, both the district court and the appellate court review the decision to determine whether the agency acted within its jurisdiction and whether sufficient, relevant evidence supports the decision of the agency.[3] The evidence is sufficient, as a matter of law, if an administrative tribunal could reasonably find the facts as it did based on the testimony and exhibits contained in the record before it.[4] In addition, the administrative action must not be arbitrary or capricious.[5] The reviewing court in an error proceeding is restricted to the record before the administrative agency and does not reweigh evidence or make independent findings of fact.[6]
[5,6] We determine jurisdictional issues that do not involve factual disputes as *667 a matter of law.[7] On a question of law, we reach a conclusion independent of the court below.[8]

ANALYSIS

JURISDICTION
[7] The County argues that the district court correctly determined it lacked jurisdiction to decide issues related to the Department's breach of the CBA. Relying on Jackson v. County of Douglas,[9] it contends that a claim for breach of a collective bargaining agreement against a county is subject to § 23-135.
Section 23-135 is the county claims statute. It provides, in relevant part, that "[a]ll claims against a county shall be filed with the county clerk within ninety days from the time when any materials or labor, which form the basis of the claims, have been furnished or performed. . . ." We discussed the county claims statute in Jackson. There, the county required some employees to show up for their shift 15 minutes early to exchange information with employees on the previous shift. But the county never paid them for this time. In their petition, the employees alleged the county had violated provisions of their labor agreement and the Commission's rules. We concluded that their claim was an action at law for the payment of services arising out of a contractual relationship. Because the employees did not comply with the county claims statute, we held that the district court properly dismissed their petition for lack of jurisdiction. Jackson, however, is not controlling here. We see a critical distinction.
[8, 9] In Jackson, the employees were not appealing from a final order of the Commission, nor does the Commission have statutory authority to hear appeals that are unrelated to disciplinary actions.[10] In contrast, in appeals from the Commission's final orders, the appeal "shall be in the manner provided in sections 25-1901 to 25-1908."[11] That is, under § 23-2515, an appeal from a final order of the Commission is a petition in error, notas in Jackson  an original breach of contract action against the county. Neb.Rev.Stat. § 25-1901 (Cum.Supp.2006) provides that a "judgment rendered or final order made by any tribunal, board, or officer exercising judicial functions and inferior in jurisdiction to the district court may be reversed, vacated, or modified by the district court." And unlike a direct breach of contract action against the County, the County is on full notice of a breach of contract claim arising out of a labor agreement when the employee has complied with the County's agreed-upon procedures for asserting the claim.
[10, 11] We have held that the Commission is a statutorily created tribunal that is required to act in a judicial manner when deciding employee appeals.[12] When the Commission acts in a judicial manner, a party adversely affected by its decision is entitled to appeal to the district court through the petition in error statutes.[13] Thus, the court erred in concluding that it *668 lacked jurisdiction over Pierce's claims that the Department violated the CBA as far as those claims were related to his termination. As stated, however, we do not reach the merits of these claims.

EMPLOYEE'S BURDEN OF PROOF UNDER CANIGLIA IS QUESTIONABLE
Pierce contends that the Commission's decision to terminate his employment was arbitrary and capricious because it was unsupported by competent evidence. The County counters that the district court properly relied on Caniglia.[14] The County argues that in an appeal from a disciplinary action, this court puts the burden of persuasion on the employee. It argues that under Caniglia, the Commission correctly found that Pierce had failed to prove someone accompanied him and that his presence in Nahriri's unit was excused.
In Caniglia, we discussed an employee's burden of proof in appealing a disciplinary action to a city's personnel board. We stated that the employee had the "burden to show that good cause for her dismissal did not exist."[15]Caniglia, however, is an anomaly in our case law. In no other case has this court placed the burden on the employee to prove good cause did not exist in a disciplinary action.
[12] Notably, Caniglia was decided before Cleveland Board of Education v. Loudermill.[16] Neb. Rev. Stat § 23-2510 (Reissue 1997) does provide that county employees may "appeal" a disciplinary order to the Commission. But when an employee has a protected property interest in continued employment, the Commission's public hearing[17] is usually the postdeprivation hearing. That hearing satisfies due process requirements under Loudermill. Because the evidentiary hearing before the reviewing tribunal or agency is de novo, many courts hold that the employing authority bears the burden of proving that the employee engaged in the conduct on which the authority based its disciplinary charge.[18]
But we decline to decide the continued vitality of Caniglia. Assuming arguendo that the County proved Pierce was in Nahriri's unit unaccompanied, we nonetheless reverse. We conclude that the County has failed to show Pierce's mere violation of a work restriction, without any other showing of misconduct, warranted termination as a second offense of "[i]mmoral, indecent, disgraceful, or inappropriate conduct."

THE RECORD DOES NOT SUPPORT THE DEPARTMENT'S ALLEGED SECOND OFFENSE OF IMMORAL, INDECENT, DISGRACEFUL, OR INAPPROPRIATE CONDUCT
[13] In addition to contending that the County failed to prove he was unaccompanied, Pierce contends the evidence fails to show that he engaged in "[i]mmoral, indecent, disgraceful, or inappropriate conduct." Obviously, Pierce's conduct did not rise to the level of immoral, indecent, or disgraceful. The question is whether it constituted "inappropriate conduct." We agree that the term "inappropriate conduct," *669 standing alone, could be broad enough to encompass any improper conduct by an employee. In this case, however, we decline to interpret it that broadly. The record clearly shows the Department did not consider Pierce's conduct on August 6, 2002, to be a serious offense warranting termination.
First, as Pierce argues, the CBA required the Department to initiate a disciplinary action within 10 days from the time his supervisor learned of the incident. That was not done. Nahriri wrote in her August 6, 2002, incident report that she had contacted the personnel director and Pierce's supervisor on that same morning. However, the Department took no disciplinary action in response to Nahriri's allegation until August 26-20 days later.
Second, the supervisor's disciplinary action on August 26, 2002, was an oral reprimand, an informal disciplinary action. The commission's personnel manual provides: "Where corrective action can be accomplished through . . . oral reprimands or warnings, formal disciplinary action should not be taken." By giving Pierce an oral reprimand, the Department signaled that the violation did not justify formal disciplinary action.
Third, Pierce's alleged unaccompanied presence in Nahriri's unit would have violated the personnel directive and the Department's oral directives after the Commission's 2001 order. Although Hill testified that she did not perceive Pierce's conduct as threatening in any way, his alleged conduct unquestionably fell within less serious categories of offenses under the Commission's personnel manual. Yet, the Department took no action consistent with the lesser offenses.
Those lesser offenses included "[f]ailure to observe written . . . orders prescribed by competent authority . . . where safety of persons or property is not endangered thereby." The punishment for an employee's first failure to observe a written order is an official written reprimand. Unlike an oral reprimand, a written reprimand is a formal disciplinary action.
Similarly, the Department could have charged him with insubordination, i.e., refusal to obey orders. The punishment for a first insubordination offense is an official written reprimand to a 1-day suspension. But the Department did not issue a written reprimand for either offense. Thus, although Pierce's alleged violation of a written order constituted two lesser offenses, the Department apparently did not consider Pierce's conduct to rise even to this level.
We cannot judge an offense of "inappropriate conduct" in a vacuum, detached from the consequences for the offense. The Commission's personnel manual shows that this offense is reserved for conduct that minimally warrants a 1- to 10-day suspension for a minor first offense or termination for a major first offense or for any second offense. Clearly, "inappropriate conduct" was not intended to include less serious offenses under the personnel manual. But the record shows the Department did not consider Pierce's alleged conduct on August 6, 2002, to be insubordination or a failure to observe a written order. In fact, it never considered the August 6 conduct, standing alone, serious enough to warrant any formal disciplinary action. Therefore, its decision to charge Pierce with a second offense of "[i]mmoral, indecent, disgraceful, or inappropriate conduct" can only be explained by Nahriri's second allegation on August 29.
The Department issued its notice of disciplinary charges on September 9, 2002, over 1 month after Pierce's alleged misconduct on August 6. As noted, on August 29, Nahriri alleged that Pierce had looked at *670 her through a window while she was eating lunch in the courtyard. In its notice of disciplinary charges, the Department included this second incident to bolster its allegation that Pierce's August 6 conduct now constituted a serious offense warranting termination. But Pierce was not restricted from the courtyard, and at the Commission's hearing, he denied the allegation that he had looked at Nahriri; Nahriri did not testify. The Commission did not discuss the August 29 allegation in its order and based its decision solely on Pierce's failure to prove that someone had accompanied him on August 6. Thus, we do not consider the second allegation.
Both the Department's delay in responding to Nahriri's first allegation and the low level of its disciplinary response shows that it did not consider Pierce's alleged conduct on August 6, 2002, to be a serious offense warranting termination. Pierce did not speak or make any gestures to Nahriri, nor did he do anything intimidating or offensive. Hill corroborated his testimony that he immediately left the area after she told him she would clean up the ice. Under these circumstances, we conclude that even if the Department proved Pierce engaged in the conduct of which he was accused, it was not an offense warranting termination.

CONCLUSION
[14] We conclude that the district court erred in refusing to review Pierce's claims that the Department violated grievance procedures under the CBA in terminating his employment. In a petition in error appeal from the Commission, the district court has jurisdiction to determine contract issues related to disciplinary actions; the petitioner is not required to file a claim with the county under § 23-135.
Regarding Pierce's claims of insufficient evidence, we conclude that the evidence fails to show that the Department considered Pierce's alleged conduct on August 6, 2002, to be a serious violation of the personnel manual, warranting termination. The Department's decision to charge Pierce with a second offense of "[i]mmoral, indecent, disgraceful, or inappropriate conduct" was apparently motivated by a second allegation of misconduct that played no role in the Commission's decision to uphold Pierce's termination. The district court therefore erred in affirming Pierce's termination based on his alleged conduct on August 6. Accordingly, we reverse the district court's judgment, which affirmed the decision of the Commission to uphold Pierce's termination. We remand the cause with directions to the district court to remand the case to the Commission to vacate its order.
REVERSED AND REMANDED WITH DIRECTIONS.
NOTES
[1] Caniglia v. City of Omaha, 210 Neb. 404, 315 N.W.2d 241 (1982).
[2] See Neb.Rev.Stat. § 23-135 (Cum.Supp. 2002).
[3] See Hickey v. Civil Serv. Comm. of Douglas Cty., 274 Neb. 554, 741 N.W.2d 649 (2007).
[4] See, Barnett v. City of Scottsbluff, 268 Neb. 555, 684 N.W.2d 553 (2004); Geringer v. City of Omaha, 237 Neb. 928, 468 N.W.2d 372 (1991).
[5] See, Hickey, supra note 3; Hammann v. City of Omaha, 227 Neb. 285, 417 N.W.2d 323 (1987).
[6] Cox v. Civil Serv. Comm. of Douglas Cty., 259 Neb. 1013, 614 N.W.2d 273 (2000).
[7] See Douglas Cty. Bd. of Comrs. v. Civil Serv. Comm., 263 Neb. 544, 641 N.W.2d 55 (2002).
[8] See id.
[9] Jackson v. County of Douglas, 223 Neb. 65, 388 N.W.2d 64 (1986).
[10] See Douglas Cty. Bd. of Comrs., supra note 7.
[11] Neb.Rev.Stat. § 23-2515 (Reissue 1997).
[12] See Douglas Cty. Bd. of Comrs., supra note 7.
[13] Id.
[14] Caniglia, supra note 1.
[15] Id. at 407, 315 N.W.2d at 243.
[16] Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).
[17] See Neb.Rev.Stat. § 23-2511 (Reissue 1997).
[18] See, e.g., Cal. Correctional Peace v. State Person., 10 Cal.4th 1133, 899 P.2d 79, 43 Cal.Rptr.2d 693 (1995); Department of Institutions v. Kinchen, 886 P.2d 700 (Colo. 1994); Thompson v. New Orleans Dept., 844 So.2d 940 (La.App.2003); Thurmond v. Steele, 159 W.Va. 630, 225 S.E.2d 210 (1976).